Nebraska Supreme Court Online Library
www.nebraska.gov/apps-courts-epub/
04/01/2016 09:05 AM CDT

STATE OF NEBRASKA, APPELLEE, V.
ROBERT W. GRANT, APPELLANT.
___ N.W.2d ___

Filed April 1, 2016.    No. S-15-192.

1. **Motions to Suppress: Confessions: Constitutional Law: Appeal and Error.** In reviewing a trial court's ruling on a motion to suppress, whether based on a claimed violation of the Fourth Amendment or on its alleged involuntariness, an appellate court applies a two-part standard of review. Regarding historical facts, the appellate court reviews the trial court's findings for clear error. Whether those facts meet constitutional standards, however, is a question of law, which the appellate court reviews independently of the court's determination.

2. **Confessions: Constitutional Law.** Under *Jackson v. Denno*, 378 U.S. 368, 84 S. Ct. 1774, 12 L. Ed. 2d 908 (1964), courts must institute fair procedures to determine whether a confession is voluntary, because involuntary or coerced confessions cannot be introduced into evidence.

3. **Confessions: Police Officers and Sheriffs: Due Process.** While the totality of the circumstances weighs on the question whether a statement was voluntary, coercive police activity is a necessary predicate to the finding that a confession is not voluntary within the meaning of the Due Process Clause of the 14th Amendment.

4. **Constitutional Law: Miranda Rights: Self-Incrimination.** *Miranda v. Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966), prohibits the use of statements derived during custodial interrogations unless the prosecution demonstrates that its agents used procedural safeguards that are effective to secure the privilege against self-incrimination.

5. **Miranda Rights.** The relevant inquiry in determining "custody" for purposes of *Miranda* rights is whether, given the objective circumstances of the interrogation, a reasonable person would have felt he or she was not at liberty to terminate the interaction and leave.

6. **Miranda Rights: Police Officers and Sheriffs: Words and Phrases.** "Interrogation" under *Miranda v. Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966), refers not only to express questioning, but also

to any words or actions on the part of the police that the police should know are reasonably likely to elicit an incriminating response from the suspect.

7. **Arrests: Police Officers and Sheriffs.** Questioning designed to obtain biographical information necessary for routine booking is not interrogation when police have no reason to know that questioning is reasonably likely to elicit an incriminating response.

8. **Evidence: Appeal and Error.** The exercise of judicial discretion is implicit in decisions to admit evidence based on relevancy or admissibility, and those decisions will not be overturned by an appellate court in the absence of an abuse of discretion.

9. **Criminal Law: Juries: Evidence.** In a jury trial of a criminal case, an erroneous evidentiary ruling results in prejudice to a defendant unless the State demonstrates that the error was harmless beyond a reasonable doubt.

10. **Trial: Convictions: Evidence.** Where the evidence is cumulative and there is other competent evidence to support the conviction, the improper admission or exclusion of evidence is harmless beyond a reasonable doubt.

11. **Rules of Evidence: Hearsay: Proof.** Hearsay is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted.

12. **Hearsay.** If an out-of-court statement is not offered for the purpose of proving the truth of the facts asserted, it is not hearsay.

13. **Trial: Expert Witnesses: Appeal and Error.** An appellate court reviews de novo whether the trial court applied the correct legal standards for admitting an expert's testimony.

14. ____: ____: ____. An appellate court reviews for abuse of discretion how the trial court applied the appropriate standards in deciding whether to admit or exclude an expert's testimony.

15. **Rules of Evidence: Expert Witnesses.** Under Neb. Evid. R. 702, Neb. Rev. Stat. § 27-702 (Reissue 2008), a witness can testify concerning scientific, technical, or other specialized knowledge only if the witness qualifies as an expert.

16. **Trial: Expert Witnesses.** A general foundational objection is insufficient to preserve an issue under *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S. Ct. 2786, 125 L. Ed. 2d 469 (1993), and *Schafersman v. Agland Coop*, 262 Neb. 215, 631 N.W.2d 862 (2001).

17. **Evidence: Words and Phrases.** Evidence is relevant if it tends in any degree to alter the probability of a material fact.

18. **Rules of Evidence.** Under Neb. Evid. R. 403, Neb. Rev. Stat. § 27-403 (Reissue 2008), relevant evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice.

19. **Appeal and Error.** An alleged error must be both specifically assigned and specifically argued in the brief of the party asserting the error to be considered by an appellate court.

20. **Rules of Evidence: Witnesses.** Neb. Evid. R. 602, Neb. Rev. Stat. § 27-602 (Reissue 2008), prohibits a witness from testifying unless evidence is introduced to support a finding that the witness has personal knowledge of the matter.

21. **Rules of Evidence: Appeal and Error.** An objection that evidence is irrelevant does not preserve for review any objection under Neb. Evid. R. 403, Neb. Rev. Stat. § 27-403 (Reissue 2008).

22. **Trial: Evidence: Appeal and Error.** Because authentication rulings are necessarily fact specific, a trial court has discretion to determine whether evidence has been properly authenticated. An appellate court reviews a trial court's ruling on authentication for abuse of discretion.

23. **Criminal Law: Trial: Evidence.** Where objects pass through several hands before being produced in court, it is necessary to establish a complete chain of evidence, tracing the possession of the object or article to the final custodian; and if one link in the chain is missing, the object may not be introduced in evidence.

24. **Motions for Mistrial: Appeal and Error.** Decisions regarding motions for mistrial are directed to the discretion of the trial court, and will be upheld in the absence of an abuse of discretion.

25. **Criminal Law: Motions for Mistrial: Appeal and Error.** A mistrial is properly granted in a criminal case where an event occurs during the course of a trial which is of such a nature that its damaging effect cannot be removed by proper admonition or instruction to the jury and thus prevents a fair trial.

26. **Motions for Mistrial: Proof.** A defendant faces a higher threshold than merely showing a possibility of prejudice when attempting to prove error predicated on the failure to grant a mistrial. Instead, the defendant must prove the alleged error actually prejudiced him or her, rather than creating only the possibility of prejudice.

27. **Mental Competency: Appeal and Error.** The trial court's determination of competency will not be disturbed unless there is insufficient evidence to support the finding.

28. **Courts: Mental Competency.** The means to be employed to determine competency or the substantial probability of competency within the foreseeable future are discretionary with the district court, and the court may cause such medical, psychiatric, or psychological examination of the accused to be made as he or she deems necessary in order to make such a determination under Neb. Rev. Stat. § 29-1823(1) (Reissue 2008).

29. **Trial: Pleas: Mental Competency.** A person is competent to plead or stand trial if he or she has the capacity to understand the nature and object of the proceedings against him or her, to comprehend his or her own condition in reference to such proceedings, and to make a rational defense.

30. **Trial: Judges.** In Nebraska, a trial judge has broad discretion over the conduct of a trial.

31. **Jury Instructions: Appeal and Error.** Whether jury instructions are correct is a question of law, which an appellate court resolves independently of the lower court's decision.

32. **Jury Instructions.** When instructing the jury, it is proper for the court to describe the offense in the language of the statute.

33. **Criminal Law: Convictions: Evidence: Appeal and Error.** When reviewing for sufficiency of the evidence to sustain a conviction, the relevant question for an appellate court is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.

Appeal from the District Court for Douglas County: GREGORY M. SCHATZ, Judge. Affirmed.

Thomas C. Riley, Douglas County Public Defender, and John J. Jedlicka for appellant.

Douglas J. Peterson, Attorney General, and Erin E. Tangeman for appellee.

HEAVICAN, C.J., WRIGHT, CONNOLLY, MILLER-LERMAN, CASSEL, and STACY, JJ.

HEAVICAN, C.J.

## I. NATURE OF CASE

Robert W. Grant appeals from his convictions of murder in the first degree and use of a deadly weapon to commit a felony in connection with the death of his girlfriend, Trudy McKee. Grant raises 14 assignments of error, ranging from overruled evidentiary objections to errors in the conduct of trial and the insufficiency of evidence. We affirm.

## II. BACKGROUND

### 1. McKee and Carter Move
### to Omaha in July 2013

Grant and McKee had been in an "on again, off again" relationship for a number of years preceding McKee's death on September 17, 2013. McKee and her 16-year-old daughter, Alexis Carter, moved from Wichita, Kansas, to Omaha, Nebraska, on July 26, 2013. Carter testified that Grant did not help McKee and Carter pack or move. Nor did Carter see any signs of Grant at the new apartment during the first week in Omaha. Carter testified that she believed Grant and McKee's relationship was over at that time.

### 2. Grant's Move to Omaha in August 2013
### and His Arguments With McKee

At some point roughly 2 weeks after McKee and Carter moved to Omaha, Carter came home from school to find Grant at the apartment. Carter testified that Grant had two duffelbags with him, including a black and yellow duffelbag. From that time until September 17, 2013, when McKee died, Grant stayed at the apartment some nights and at homeless shelters the rest of the time.

Carter testified that after Grant arrived in Omaha, McKee became uneasy and was less outgoing than she had been during the first week after moving from Wichita. According to Carter, during the week leading up to McKee's death, Grant and McKee argued more than they had when they lived in Wichita. One of the arguments was about a T-shirt Grant wore that read "'almost single.'" Carter said this argument took place around the first week of September. According to Carter, this and two other arguments during that time period were loud, ranging from 7 to 12 on a 10-point scale.

### 3. McKee's Death and Grant's Whereabouts
### on September 17, 2013

On Tuesday, September 17, 2013, Carter woke up around 6:30 or 6:40 a.m. Carter testified that she followed her normal

morning routine and did not notice anything out of the ordinary in the apartment's joined bathrooms. She checked in McKee's bedroom before leaving and saw Grant and McKee sleeping soundly in bed. Carter then left for school at about 7:30 a.m.

In an apparent attempt to establish the time of McKee's death, the State offered the testimony of a witness who lived in the apartment directly above McKee and Carter's. She testified that between 9 and 9:30 a.m., she heard a man and a woman arguing. She could not tell from where the sound originated. After the witness noticed a brief pause in the argument, she then heard screaming that she described as "scary" and "chilling," which lasted 3 or 4 minutes. The State also called Jessica Von Seggern, another neighbor in the building. Von Seggern was awake and home all morning and afternoon except for a brief time from roughly 9:15 to 9:40 a.m. Von Seggern testified that she did not hear anything in the building that morning.

In addition, McKee's sister had attempted to call McKee's cell phone sometime between 9 and 10 a.m. McKee did not answer, which her sister testified was abnormal. McKee's cell phone was later recovered from a toilet in the apartment, and Thomas Queen, the lead detective, found that McKee had four missed calls between 8:45 a.m. and noon. During trial, Grant referenced a call detail sheet from McKee's cell phone provider showing that a call was placed from McKee's cell phone to her voice mail inbox at 10:33 a.m. The State responded to this evidence by eliciting testimony that anybody holding McKee's cell phone could have made outgoing calls.

A friend of Grant's who lived in Omaha testified that Grant called him around 10 to 10:30 a.m. The friend heard people in the background and asked Grant where he was; Grant replied that he was at a bus station. The friend testified that Grant had an unusual "quivery" and "hyper" tone in his voice. During the conversation, Grant and the friend made plans for Grant to visit his home later that morning, but Grant never arrived.

Carter got home from school around 3:30 p.m. She testified that she did not see anything unusual in the apartment building hallway and that the door to the apartment itself was locked from the outside. Elaine Adler, the apartment manager, noted that the doorknob could be locked from the inside on the way out of the apartment. But the deadbolt had to be locked with a key from the outside. Carter never specified which lock—the knob or the deadbolt—was locked when she came home. Only the leasing office, Carter, and McKee had keys to the apartment.

According to Carter's testimony, when she got home, she first entered her own bedroom and saw Grant's "'almost single'" T-shirt, which had been the subject of one of Grant and McKee's recent arguments, draped over Carter's television.

Carter then entered McKee's bedroom and found her mother's body on the floor, "[c]ut up." She started screaming and ran out into the building's hallway. Hearing the screaming, Von Seggern intercepted Carter. While Von Seggern called the 911 emergency dispatch service, Carter ran back into her own apartment and attempted to lift McKee's body. She then exited the apartment again and, in the following minutes, left McKee's blood on several surfaces in the building's hallway.

Von Seggern and Carter waited for law enforcement outside the building and placed a call to Adler. Adler arrived shortly with two maintenance men and a leasing agent. Adler testified that when they arrived, Carter was "[e]xtremely upset. Crying. Screaming. Frantic [and] overwhelmed" and that Carter was saying, "'[t]hat fucker, that fucker, he killed her, I know he killed her. My mom's dead.'"

Adler and the maintenance men then entered McKee and Carter's apartment hoping to save McKee's life; but it was too late. Adler testified that they did not touch anything in the apartment other than the door and a few light switches.

After that point, law enforcement arrived at the scene. Further details of the police investigation at the scene are related below.

#### 4. Grant's Arrest

Matthew Partridge, an employee of a security company, was providing security at a bus station in Omaha on the evening of September 17, 2013. Partridge was monitoring the boarding of a bus to Chicago, Illinois, when he became aware of a man, later identified as Grant, bypassing the ticket-checking line to board the bus. Partridge confronted Grant and determined that he did not have a ticket. Partridge detained Grant in handcuffs and brought him to a security office.

While Grant was detained in the office, Partridge contacted police. Partridge asked Grant for his name, address, and other identifying information. Grant gave a false name, "Brian Edwards." Grant told Partridge that he had come from Wichita to be with a girlfriend, but that they had broken up. Grant said he was trying to get to Chicago to meet another woman he had met online. Partridge testified that Grant did not appear to have any luggage with him.

After about 15 minutes, two police officers arrived. Officer Kevin Checksfield was one of the officers who responded to the bus station. Checksfield asked Grant for physical identification; claiming to have none, Grant told Checksfield his name was "Brian Edwards" and that his date of birth was January 25, 1987. Checksfield then engaged in a line of questioning designed to determine whether, under the Omaha Police Department's policy, Grant should either be issued a citation or be taken to a correctional center for booking. Determining that Grant had no ties to the community, Checksfield decided that Grant should be placed under arrest and transported to the correctional center. Throughout the time Grant was detained in the security office, he repeatedly asked to be let off with a warning or citation.

At the correctional center, Checksfield attempted to locate information for a "Brian Edwards" in a law enforcement database. Finding none, Checksfield confronted Grant. Grant gave three more false dates of birth. After Checksfield decided to fingerprint Grant in an effort to identify him, Grant told Checksfield his real name and date of birth.

Shortly after Checksfield and his partner booked Grant, Det. Sherry King, who was on the team investigating McKee's death, received notification of Grant's arrest. King arranged for Grant to be transported from the correctional center to police central headquarters. In a pretrial hearing, King testified that she interviewed Grant at headquarters about McKee's death. Before Grant had been read his *Miranda* rights, King asked about Grant's whereabouts throughout the day. But at trial, King never testified to Grant's statements of his whereabouts on September 17, 2013.

King finally read Grant his rights at police central headquarters after she had obtained biographical information and information about his whereabouts that day. At that point, Grant invoked his right to an attorney and did not thereafter waive his *Miranda* rights.

### 5. POLICE INVESTIGATION OF McKEE'S DEATH

After police secured the scene and paramedics confirmed that McKee was dead, police began their investigation in earnest.

The apartment door showed no signs of forced entry. Nor were there signs of a struggle anywhere outside of the master bedroom.

Police interviewed a number of potential witnesses, and eventually spoke to all of the tenants in McKee's building. One tenant told an officer that he had had a third-party maintenance crew in his apartment the morning of September 17, 2013. But detectives in the homicide unit apparently never received that information and did not speak with the third-party maintenance crew. Detectives did, however, speak with Carter, Adler, Grant's brother, Grant's sister, McKee's ex-husband, and McKee's former coworkers.

Det. Ryan Hinsley testified about Carter's demeanor when he interviewed her at the police station on September 17, 2013. Hinsley stated that Carter was crying, upset, and making spontaneous utterances. When the State asked whether Carter's

demeanor changed over the course of the interview, Hinsley testified, "she began calming down. Throughout the interview she would break out into tears again."

At trial, the State introduced a substantial number of photographs of the master bedroom. Blood spatter covered nearby furniture and walls, with some drops extending 6 to 8 feet from the body. Crime laboratory technician James Brady testified that the blood spatter suggested that McKee had been stabbed with "a great deal of force." The State also introduced a number of autopsy photographs. The autopsy eventually revealed that McKee had suffered more than 50 cutting wounds, mostly in the upper body.

In the apartment police found, as relevant on appeal, the following pieces of evidence: the "'almost single'" T-shirt; McKee's cell phone, which was found in a toilet; a black and yellow "Dale Junior 88" duffelbag; McKee's purse, covered in blood and containing her wallet with coins but no cash, a checkbook, bank cards, and medication; a bloody shoeprint on the bathroom floor; indications that somebody had washed off blood in the shower; and black hairs found in each of McKee's hands.

Inside the Dale Junior 88 duffelbag, police discovered, in relevant part, several packages of alcohol swabs, a maroon tank top with a blue tank top inside of it, black pants, and black and white, size-10 Adidas shoes. The clothing, the shoes, and several other items in the bag had significant amounts of blood on them.

Brady processed the shoeprint found on the bathroom floor with a type of chemical that produces a more visible stain. Brady testified that the tread of the shoeprint matched the tread of the Adidas shoes found in the Dale Junior 88 duffelbag.

Eventually, the maroon tank top and Adidas shoes were sent to the University of Nebraska Medical Center (UNMC) for DNA testing. Additionally, the Nike shoes that Grant had been wearing during his arrest, envelopes that were used to collect

the black hairs found in McKee's hands, and DNA swabs taken from McKee's fingernails were sent to UNMC.

Before these evidentiary items were sent for testing, there was some discussion in the homicide unit that the sergeant in charge of the unit wanted to look at the hairs collected from McKee's hands. It is unclear whether the sergeant did actually remove the hairs from evidence. At the time of trial, there was an ongoing internal police investigation into the sergeant's actions.

Later, when a forensic DNA analyst from the UNMC laboratory, Melissa Helligso, opened the envelope supposed to contain hairs collected from McKee's left hand, Helligso could not find anything in the envelope. The hairs were never found. Thus, the hairs collected from McKee's left hand were never tested.

Helligso testified extensively about the process of DNA testing and the results of her testing in this case. As she explained, DNA testing can produce three results: exclusion of the known sample as a source, inability to exclude the known sample as a source, or inconclusive. Known source samples were taken from Grant and McKee in this case.

Testing on the black hairs from McKee's right hand, the blood on the Adidas shoes, the blood on the maroon tank top, and the drop of blood on the Nike shoes did not exclude McKee as the source. Samples from the inside of the Adidas shoes, the inside of the Nike shoes, and the inside of the maroon tank top showed multiple DNA contributors. For the Nike shoes, Helligso was able to isolate a major contributor, and testing revealed Grant could not be excluded as that major contributor. Testing of the maroon tank top could not exclude Grant and McKee as contributors.

Testing of the inside of the Adidas shoes could exclude neither Grant nor McKee. The probability of individuals unrelated to Grant or McKee matching either contributor of DNA on the Adidas shoes was 1 in 1,810,000 for Caucasians, 1 in 983,000 for African-Americans, and 1 in 2,010,000 for American Hispanics.

The alcohol swabs found in the duffelbag were not tested for fingerprints. When asked to explain why, Queen testified that police had been told the duffelbag belonged to Grant and that therefore, they would expect to find Grant's fingerprints.

### 6. Conduct of Trial

An 8-day trial was held in the district court for Douglas County in October 2014. Prior to trial, Grant's counsel requested that the district court order a psychological evaluation of Grant. There had been some indication during discovery that Grant might suffer from paranoid schizophrenia. The court granted the request, and the results of the evaluation showed that Grant was competent to stand trial.

Grant's defense theory centered largely on the missing hairs from McKee's left hand as well as the fact that more items of evidence were not tested for DNA or for fingerprints. Grant also pointed out that Carter had given somewhat conflicting information about Grant's possessions. In one interview, Carter told police that Grant's only pair of black and white shoes were Nike brand and that she was not familiar with a pair of Adidas shoes. Additionally, Carter originally described Grant's black and yellow duffelbag as a Nike brand, rather than Dale Junior 88.

On the sixth day of trial, just after breaking for lunch and outside the presence of the jury, Grant apparently hit one of the court deputies. After lunch, the court questioned the jury to ascertain whether any members had witnessed any part of the incident. The district court questioned five jurors individually who had said they saw something during lunch. Each of the five jurors had seen officers running in response to radio calls. Four of the jurors did not know whether the incident involved Grant. One juror had assumed the incident had to do with Grant's case. Another juror noted that because she was now being questioned about what she had seen, she "had questions" about what had occurred. Of the five jurors, the district court asked four (including the two who had speculated that

the incident involved Grant) whether they could still be fair and impartial; they answered that they could.

Grant moved for a mistrial, claiming that because two of the jurors had speculated that Grant was involved in the incident, they could no longer remain impartial. The district court denied the motion.

On the seventh day of trial, Grant had another outburst. This time Grant struck his defense attorney in the presence of the jury. The jury was removed from the courtroom and then dismissed until the following day and given the usual admonitions.

Counsel for Grant moved again for a mistrial and submitted an affidavit to the district court expressing concerns about Grant's mental health and competency to stand trial. Defense counsel asked for a short recess and psychological evaluation in light of the incidents on the sixth and seventh days of trial and the information provided in counsel's affidavit.

In support of the motion for mistrial, Grant attempted to present testimony of Todd Cooper, a reporter who was in the courtroom at the time of Grant's outburst on the seventh day of trial. But when Cooper expressed reluctance to testify because of his job as a reporter, the court suggested that Grant use another witness to get the information. Grant then attempted to present testimony by Kelly Steenbock, an employee of the Douglas County Public Defender who had interviewed Cooper about what he witnessed. During Steenbock's testimony, Cooper, apparently from the courtroom gallery, made a hearsay objection, claiming he had the right to do so under the First Amendment. The State then objected to Steenbock's testimony on hearsay grounds and suggested that Grant may be able to prove the day's events through Hinsley, who was on the stand during the outburst. Instead, Grant made an offer of proof through Steenbock about what Cooper had related to her.

The district court overruled the motion for mistrial and denied counsel's request for a recess. The district court

reasoned that the pretrial psychological evaluation showed Grant was competent to stand trial and that counsel's affidavit did not present sufficient evidence to change that finding.

At the close of trial, the district court gave the jury instructions, in relevant part, defining the elements of murder in the first degree, murder in the second degree, and intentional manslaughter.

The jury found Grant guilty of first degree murder and guilty of use of a deadly weapon to commit a felony. The district court sentenced Grant to life imprisonment for first degree murder, and a period of 50 to 50 years' imprisonment for use of a deadly weapon, to be served consecutively, with credit for 504 days of time served. Grant appeals.

## III. ASSIGNMENTS OF ERROR

Grant assigns, restated and renumbered, that the district court erred in:

(1) admitting Grant's statements at the bus station, at the correctional center, and at the Omaha Police Department central headquarters, in violation of *Miranda v. Arizona*[1] and *Jackson v. Denno*[2];

(2) permitting Queen to testify that the duffelbag belonged to Grant;

(3) admitting Adler's testimony of Carter's out-of-court statement that "'he killed her'";

(4) allowing Brady to testify that a shoeprint matched the tread of the Adidas shoes;

(5) admitting exhibit 206 and allowing Hinsley and a crime laboratory technician to testify about Grant's demeanor;

(6) allowing Carter to testify that Grant and McKee were not a couple in July 2013 until after the first week McKee and Carter lived in Omaha;

---

[1] *Miranda v. Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966).

[2] *Jackson v. Denno*, 378 U.S. 368, 84 S. Ct. 1774, 12 L. Ed. 2d 908 (1964).

(7) allowing Hinsley to testify about Carter's demeanor while she was being questioned;

(8) admitting 11 autopsy photographs over Grant's objections;

(9) admitting the maroon tank top and black pants into evidence;

(10) denying Grant's first and second motions for mistrial;

(11) denying Grant's motion for a recess and psychological evaluation of Grant;

(12) permitting Cooper to refuse to testify and giving Cooper standing to object; and

(13) including the words "without malice" in the jury instruction for intentional manslaughter.

Grant also assigns that

(14) there was insufficient evidence to support his convictions.

## IV. ANALYSIS

### 1. *Miranda v. Arizona* and *Jackson v. Denno*

In Grant's first assignment of error, he asserts that the State violated *Miranda v. Arizona* and *Jackson v. Denno* by introducing statements Grant made to Partridge and to Checksfield.

### (a) Standard of Review

[1] In reviewing a trial court's ruling on a motion to suppress, whether based on a claimed violation of the Fourth Amendment or on its alleged involuntariness, an appellate court applies a two-part standard of review. Regarding historical facts, the appellate court reviews the trial court's findings for clear error. Whether those facts meet constitutional standards, however, is a question of law, which the appellate court reviews independently of the court's determination.[3]

---

[3] *State v. McClain*, 285 Neb. 537, 827 N.W.2d 814 (2013).

(b) Analysis

[2,3] Grant first assigns that the State violated *Jackson*, in which the U.S. Supreme Court held that courts must institute fair procedures to determine whether a confession is voluntary, because involuntary or coerced confessions cannot be introduced into evidence.[4] While the totality of the circumstances weighs on the question whether a statement was voluntary, "coercive police activity is a necessary predicate to the finding that a confession is not voluntary within the meaning of the Due Process Clause of the 14th Amendment."[5] We find that the district court complied with *Jackson* by holding an appropriate pretrial hearing to assess whether Grant's statements were voluntary.

The nature of Grant's *Jackson* argument is not clear from his brief. But, to the extent Grant may have preserved his argument, it lacks merit. The district court held a pretrial hearing on Grant's motion to suppress and determined that the relevant statements were voluntary and did not violate *Miranda*. The district court determined that statements made by Grant to Partridge and Checksfield in the bus station were admissible.

Further, there is nothing in the facts of this case to suggest that Grant had been coerced into making the statements introduced at trial. He was never threatened or offered any bargains in return for his choice to make statements to Partridge or Checksfield.

Because the district court held a full hearing on the admissibility of Grant's statements, we find no merit to Grant's arguments with respect to *Jackson*.

[4] Next, Grant argues that the introduction of his statements violated *Miranda*. *Miranda* prohibits the use of statements derived during custodial interrogations unless the prosecution demonstrates that its agents used procedural safeguards that

---

[4] See *Jackson, supra* note 2.

[5] *State v. Garner*, 260 Neb. 41, 49, 614 N.W.2d 319, 327 (2000).

are effective to secure the privilege against self-incrimination.[6] At trial, Grant made continuing objections to any mentions of his statements at the bus station, at the correctional center, and at police central headquarters.

[5-7] The relevant inquiry in determining "custody" for purposes of *Miranda* rights is whether, given the objective circumstances, a reasonable person would have felt he or she was not at liberty to terminate the interaction and leave.[7] Next, "interrogation" under *Miranda* refers not only to express questioning, but also to any words or actions on the part of the police that the police should know are reasonably likely to elicit an incriminating response from the suspect.[8] Questioning designed to obtain biographical information necessary for routine booking is not interrogation when police have no reason to know that questioning is reasonably likely to elicit an incriminating response.[9]

For purposes of this analysis, we assume without deciding that Partridge, the security employee, was a state actor and that *Miranda* is applicable to his actions.

We determine that Grant was in custody when he made the statements. Partridge had restrained Grant in handcuffs almost immediately upon discovering Grant, and Grant was not free to leave after that point. Grant, in fact, made requests to be let go with a warning or citation, but was not permitted to do so.

However, Partridge and Checksfield did not interrogate Grant for purposes of *Miranda*. Partridge asked Grant only for his name, where he was from, his address, and similar information. When Checksfield arrived, he merely asked questions in line with Omaha Police Department policy, which were aimed at determining whether to issue Grant a citation or to arrest

---

[6] *State v. Walker*, 272 Neb. 725, 724 N.W.2d 552 (2006).

[7] *State v. Rogers*, 277 Neb. 37, 760 N.W.2d 35 (2009).

[8] *State v. Bauldwin*, 283 Neb. 678, 811 N.W.2d 267 (2012).

[9] See *State v. Bormann*, 279 Neb. 320, 777 N.W.2d 829 (2010).

him. At this point in time, neither Partridge nor Checksfield were aware that Grant was a suspect or person of interest in a homicide. Therefore, they had no indication whatsoever that asking Grant about his living arrangements or where he was from might elicit an incriminating response.

The district court did exclude some statements Grant had made at police central headquarters. King had asked Grant about his whereabouts on September 17, 2013, before reading Grant any *Miranda* warnings. The district court found that Grant's statements in response to King's questions were inadmissible. At trial, King testified that Grant had told King his name and that he lived at a homeless shelter. But the State did not offer any of the excluded incriminating statements Grant made about his whereabouts on September 17.

The limited statements offered through King's testimony at trial were made in response to purely biographical questions. Though King was questioning Grant in relation to McKee's death, the statements offered at trial were limited to Grant's name and where he lived. When questioning Grant, King did not have reason to believe this biographical information would be incriminating. In contrast, further pre-*Miranda* statements Grant made to King about his whereabouts on September 17, 2013, were properly excluded, because King knew that Grant's statements would likely incriminate him.

Under our well-established case law, biographical inquiries that law enforcement have no reason to believe will prompt an incriminating response are not interrogations for purposes of *Miranda*.[10] The statements admitted at trial were a result of purely biographical inquiries. Thus, we find that Grant's *Miranda* rights were not violated by the introduction of his statements.

For these reasons, Grant's first assignment of error is without merit.

---

[10] See *id.*

## 2. Admission of Alleged
### Hearsay Testimony

In Grant's second and third assignments of error, he argues that the district court erred by admitting two pieces of testimony over Grant's hearsay objections. First, Grant argues that Queen should not have been permitted to testify that he received information that the Dale Junior 88 duffelbag belonged to Grant. Second, Grant claims the court erred by admitting Adler's testimony about Carter's statements after Carter had discovered McKee's body.

### (a) Standard of Review

[8] The exercise of judicial discretion is implicit in decisions to admit evidence based on relevancy or admissibility, and those decisions will not be overturned by an appellate court in the absence of an abuse of discretion.[11]

[9,10] The improper admission of evidence is a trial error and subject to harmless error review.[12] In a jury trial of a criminal case, an erroneous evidentiary ruling results in prejudice to a defendant unless the State demonstrates that the error was harmless beyond a reasonable doubt.[13] Where the evidence is cumulative and there is other competent evidence to support the conviction, the improper admission or exclusion of evidence is harmless beyond a reasonable doubt.[14]

### (b) Hearsay

[11,12] Hearsay is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted.[15] Hearsay is

---

[11] *Sack v. Castillo*, 278 Neb. 156, 768 N.W.2d 429 (2009).

[12] *State v. Juranek*, 287 Neb. 846, 844 N.W.2d 791 (2014).

[13] *State v. Pangborn*, 286 Neb. 363, 836 N.W.2d 790 (2013).

[14] *State v. Robinson*, 271 Neb. 698, 715 N.W.2d 531 (2006).

[15] *State v. Hale*, 290 Neb. 70, 858 N.W.2d 543 (2015).

not admissible except as provided by the rules of evidence.[16] Conversely, if an out-of-court statement is not offered for the purpose of proving the truth of the facts asserted, it is not hearsay.[17]

### (c) Queen's Testimony

At trial, Grant cross-examined Queen about whether a number of items at the scene were tested for fingerprints or DNA evidence. In an attempt to raise reasonable doubt, Grant focused his defense primarily on the evidence that had not been tested. On redirect, the State asked Queen why police did not test many items Grant had discussed on cross-examination, including alcohol swabs found inside of the Dale 88 Junior duffelbag. Queen testified that he had received information that the bag belonged to Grant, so police thought there was no need to fingerprint the contents of the bag.

Grant asserts that Queen's testimony was hearsay. However, assuming without deciding that the testimony was hearsay, we hold that its admission was harmless error. Even if the State offered the out-of-court statement to prove the truth of the matter asserted, that Grant owned the duffelbag, the testimony was cumulative. Carter testified that the bag was Grant's, and DNA evidence linked Grant to items of clothing that were in the bag. Therefore, even without Queen's testimony, the State had established that the bag belonged to Grant.

Therefore, the testimony was admissible and Grant's second assignment of error is without merit.

### (d) Adler's Testimony

Adler testified that when she arrived at the apartment building, Carter was visibly extremely upset and crying, and that she was saying, "[t]hat fucker, that fucker, he killed her, I know he killed her. My mom's dead." According to Von Seggern's

---

[16] *State v. Castor*, 262 Neb. 423, 632 N.W.2d 298 (2001).

[17] *State v. McCave*, 282 Neb. 500, 805 N.W.2d 290 (2011).

testimony, Carter made these statements very shortly after finding McKee's body.

Adler's testimony was hearsay. Carter made the statement outside of court, and the State offered it in evidence apparently in order to prove the truth of the matter asserted—that Grant killed McKee. But the State argues that the statement was admissible under the excited utterance hearsay exception.

Assuming without deciding that the testimony was inadmissible, we hold that any error was harmless.

Even without looking to the admitted hearsay statement, there was a great deal of other evidence to support the conviction. DNA evidence and Carter's testimony proved that the Dale Junior 88 duffelbag and the Adidas shoes, maroon tank top, and black pants belonged to Grant. DNA evidence also linked McKee to the blood on Grant's clothing. There was no forced entry to the apartment, and the door was apparently locked from the outside after the homicide took place. The morning of McKee's death, Carter had seen Grant with McKee sleeping in bed. Furthermore, Grant and McKee had been arguing with some frequency. Finally, Grant was discovered attempting to board a bus departing Omaha and lied about his identity. When he was eventually arrested, a drop of McKee's blood was found on his shoe. This evidence overwhelmingly proves Grant's guilt.

Furthermore, the jury was well aware that Carter had not actually witnessed the murder. A reasonable trier of fact would only consider Carter's out-of-court statement in light of this knowledge. Grant's third assignment of error is without merit.

### 3. BRADY'S TESTIMONY
### REGARDING SHOEPRINT

In Grant's fourth assignment of error, he argues that the district court erred by allowing Brady to testify that the tread of the bloody shoeprint in McKee's bathroom appeared to match the tread of the Adidas shoes. Grant asserts that Brady's testimony was not proper expert witness testimony, because

Brady, a crime laboratory technician, was not qualified to compare shoeprints.

### (a) Standard of Review

[13,14] We review de novo whether the trial court applied the correct legal standards for admitting an expert's testimony.[18] We review for abuse of discretion how the trial court applied the appropriate standards in deciding whether to admit or exclude an expert's testimony.[19]

### (b) Analysis

[15] First, we note that Brady's comparison of the shoeprint was not expert testimony. Under evidence rule 702,[20] a witness can testify concerning scientific, technical, or other specialized knowledge only if the witness qualifies as an expert.[21] Brady's testimony did not require any specialized knowledge, any lay person would be capable of comparing pictures of the Adidas shoe tread and the shoeprint side by side. Therefore, Brady's testimony is not governed by rule 702.

[16] In any case, Grant has waived this argument. The objection Grant now raises on appeal was not obvious from the context at trial. We specifically stated in *State v. Ellis*[22] that a general foundational objection is insufficient to preserve an issue under *Daubert v. Merrell Dow Pharmaceuticals, Inc.*[23] and *Schafersman v. Agland Coop*.[24]

---

[18] *Roskop Dairy v. GEA Farm Tech.*, 292 Neb. 148, 871 N.W.2d 776 (2015).

[19] *Id.*

[20] Neb. Evid. R. 702, Neb. Rev. Stat. § 27-702 (Reissue 2008).

[21] *Orchard Hill Neighborhood v. Orchard Hill Mercantile*, 274 Neb. 154, 738 N.W.2d 820 (2007).

[22] *State v. Ellis*, 281 Neb. 571, 799 N.W.2d 267 (2011).

[23] *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S. Ct. 2786, 125 L. Ed. 2d 469 (1993) (setting standards for admissibility of expert testimony in federal court).

[24] *Schafersman v. Agland Coop*, 262 Neb. 215, 631 N.W.2d 862 (2001) (adopting *Daubert, supra* note 23, in Nebraska courts).

Grant objected to Brady's testimony only on the basis of "foundation." The district court likely thought that Grant was making a personal knowledge objection, as opposed to an improper expert opinion objection. We conclude that Grant has waived any argument regarding Brady's testimony. His fourth assignment of error is therefore without merit.

### 4. Grant's Demeanor at Police Central Headquarters

In Grant's fifth assignment of error, he asserts that three particular pieces of evidence about his demeanor at police central headquarters were inadmissible.

### (a) Standard of Review

The exercise of judicial discretion is implicit in decisions to admit evidence based on relevancy or admissibility, and those decisions will not be overturned by an appellate court in the absence of an abuse of discretion.[25]

### (b) Exhibit 206

First, Grant argues that exhibit 206, a photograph of him, was irrelevant and unfairly prejudicial under evidence rule 403.[26]

[17,18] Evidence is relevant if it tends in any degree to alter the probability of a material fact.[27] Under rule 403, relevant evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice.[28]

Exhibit 206 showed Grant in the clothing he was wearing when arrested. It depicts him grinning and with his hands cuffed. Pieces of molded gold plating that fit over his front teeth are visible.

---

[25] *Sack, supra* note 11.

[26] Neb. Evid. R. 403, Neb. Rev. Stat. § 27-403 (Reissue 2008).

[27] *State v. Ford*, 279 Neb. 453, 778 N.W.2d 473 (2010).

[28] *Bauldwin, supra* note 8.

The photograph was relevant to show the clothing Grant was wearing, particularly the Nike shoes that had a drop of McKee's blood on them. Additionally, Grant's demeanor during his arrest may have been relevant. But Grant argues that this probative value is outweighed by the fact that his gold teeth were visible in the picture. He claims, without reference to any sources, that white jurors become prejudiced when they see that a black man has gold teeth.

Even assuming Grant's assertion regarding prejudice is correct, any prejudicial effect Grant's gold teeth may have had on the jury cannot outweigh the very high probative value of proving that Grant was wearing an item of clothing on which McKee's blood was found. Grant's argument regarding exhibit 206 is without merit.

### (c) Testimony That Grant Was "[G]oofy"

Grant next claims that the court erred by admitting Hinsley's testimony that Grant was "goofy, not really caring as to what he was there for." Grant argues on appeal that the testimony violated rule 403.

However, Grant has waived a rule 403 objection by failing to specifically raise rule 403, as we required in *State v. Schrein*[29]: "[T]he trial court is required to weigh the danger of unfair prejudice against the probative value of the evidence only when requested to do so at trial." Grant objected only on relevance grounds and did not raise rule 403 at trial. Therefore, we need not consider Grant's rule 403 contention. Grant's argument on this point is without merit.

### (d) Testimony That Grant Was "Cooperative"

[19] Third, Grant claims the district court erred by admitting a crime laboratory technician's testimony that Grant was

---

[29] *State v. Schrein*, 244 Neb. 136, 147, 504 N.W.2d 827, 834 (1993).

"[c]ooperative." However, an alleged error must be both specifically assigned and specifically argued in the brief of the party asserting the error to be considered by an appellate court.[30] Though Grant assigns the admission of the testimony as error, he never argues why it was error. As such, we will not address this argument further.

Grant's fifth assignment of error lacks merit.

### 5. Admission of Other Testimony

In Grant's sixth and seventh assignments of error, he argues that the district court erred by admitting two additional pieces of testimony. First, Grant objects to Carter's testimony that Grant and McKee had no relationship during McKee and Carter's move from Wichita to Omaha and during the first week McKee and Carter lived in Omaha. Second, Grant argues that Hinsley should not have been permitted to testify about Carter's demeanor on the day McKee was killed.

### (a) Standard of Review

The exercise of judicial discretion is implicit in decisions to admit evidence based on relevancy or admissibility, and those decisions will not be overturned by an appellate court in the absence of an abuse of discretion.[31]

### (b) Carter's Testimony About Grant and McKee's Relationship

[20] Grant asserts the admission of Carter's testimony regarding Grant and McKee's relationship violated evidence rule 602.[32] Rule 602 prohibits a witness from testifying "unless evidence is introduced to support a finding that [s]he has personal knowledge of the matter."

Grant essentially argues that Carter should not have been able to testify about the nature of McKee's relationship with

---

[30] *State v. Cook*, 290 Neb. 381, 860 N.W.2d 408 (2015).

[31] *Sack, supra* note 11.

[32] Neb. Evid. R. 602, Neb. Rev. Stat. § 27-602 (Reissue 2008).

Grant because Carter was not present for every single encounter between Grant and McKee. But Carter did not testify about any matters or events that she did not personally witness. The State never asked Carter whether Grant and McKee were actually together. Instead, Carter testified about her personal observations of Grant's absence and her conversations with McKee. (Grant does not raise any hearsay argument regarding this testimony.) Carter testified only that she had the ***impression*** that Grant and McKee were not together.

Grant also assigns that the district court erred by admitting Carter's testimony that Grant and McKee's arguments got worse in the weeks leading up to the murder. However, although Grant assigned this error, he did not argue it in his brief and the basis of this assignment is not readily apparent from the record. An alleged error must be both specifically assigned and specifically argued in the brief of the party asserting the error to be considered by an appellate court.[33] We will not consider this argument further.

For the reasons stated, we hold that Grant's sixth assignment of error is without merit.

### (c) Hinsley's Testimony About Carter's Demeanor

At trial, Grant objected to Hinsley's testimony only on the basis of relevancy. Grant now argues that the testimony was not relevant under evidence rule 401[34] and that it was unfairly prejudicial under rule 403.

We turn first to relevancy under rule 401. Evidence is relevant if it tends in any degree to alter the probability of a material fact.[35] In this case, whether Grant killed McKee was a material fact. The State was required to prove Grant's guilt beyond a reasonable doubt. That burden gives the State a

---

[33] *Cook, supra* note 30.

[34] Neb. Evid. R. 401, Neb. Rev. Stat. § 27-401 (Reissue 2008).

[35] *Ford, supra* note 27.

strong incentive to discredit theories that another person committed the crime, even if the defense did not explicitly raise such a theory. Hinsley's testimony about Carter's demeanor was relevant under rule 401, because it tended to prove that Carter did not kill McKee.

[21] We next turn to Grant's rule 403 argument. Unless an objection to offered evidence is sufficiently specific to enlighten the trial court and enable it to pass upon the sufficiency of such objection and to observe the alleged harmful bearing of the evidence from the standpoint of the objector, no question can be presented therefrom on appeal.[36] In *Schrein*, we held that a defendant's objection that evidence is irrelevant does not preserve for review any objection under rule 403.[37] Therefore, Grant's relevancy objection did not preserve the rule 403 objection he now raises on appeal.

Grant's seventh assignment of error is without merit.

### 6. AUTOPSY PHOTOGRAPHS

In Grant's eighth assignment of error, he asserts that 11 autopsy photographs, exhibits 230 to 236, 239 to 241, and 245 were cumulative and unfairly prejudicial under rule 403. The photographs show McKee's body from various angles. Each photograph depicts several wounds, and no photograph shows exactly the same wounds as any other. The State agreed to withhold exhibits 237 and 238, because the district court suggested that they may have been cumulative. But the district court determined that none of the other photographs were cumulative.

### (a) Standard of Review

An appellate court reviews the admission of photographs of victims' bodies for abuse of discretion.[38]

---

[36] *State v. Hall*, 270 Neb. 669, 708 N.W.2d 209 (2005).

[37] *Schrein, supra* note 29.

[38] *State v. Dubray*, 289 Neb. 208, 854 N.W.2d 584 (2014).

### (b) Analysis

Under rule 403, relevant evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice or if it is needlessly cumulative.[39]

We find no error in the admission of these photographs. First, the prejudicial effect of the exhibits does not substantially outweigh their probative value. Second, the photographs were not cumulative.

The photographs were highly probative to show the condition of McKee's body, the nature of her wounds, the cause of her death, and the intent of her attacker. Admittedly, the photographs contain graphic images. But Grant is convicted of stabbing McKee more than 50 times. As we noted in *State v. Dubray*,[40] "gruesome crimes produce gruesome photographs." Thus, any prejudicial effect of the gruesome photographs does not outweigh their probative value.

Furthermore, the photographs are not cumulative, because they each portray different wounds or angles. It is not unreasonable to expect that the State must show multiple pictures in order to document all or most of McKee's numerous wounds.

For these reasons, the district court did not abuse its discretion by finding that the photographs were not unfairly prejudicial or cumulative. Grant's eighth assignment of error is without merit.

### 7. Chain of Custody of Exhibits 291 and 292

In Grant's ninth assignment of error, he argues that the district court erred by admitting the maroon tank top and black pants into evidence. Grant asserts that there was improper foundation for these exhibits to prove the chain of custody.

---

[39] See *Bauldwin, supra* note 8.

[40] *Dubray, supra* note 38, 289 Neb. at 219, 854 N.W.2d at 599.

### (a) Standard of Review

[22] Because authentication rulings are necessarily fact specific, a trial court has discretion to determine whether evidence has been properly authenticated. An appellate court reviews a trial court's ruling on authentication for abuse of discretion.[41]

### (b) Analysis

At trial, the State introduced exhibits 291 and 292 through Helligso's testimony. When the State offered exhibit 291, the maroon tank top, Grant objected on "foundation." When the State offered exhibit 292, the black pants, Grant objected on "foundation, chain of custody." The bases of both objections were, apparently, that Helligso was not personally present when the exhibits were placed into protective plastic for trial.

[23] Where objects pass through several hands before being produced in court, it is necessary to establish a complete chain of evidence, tracing the possession of the object or article to the final custodian; and if one link in the chain is missing, the object may not be introduced in evidence.[42] Proof that an exhibit remained in the custody of law enforcement officials is sufficient to prove a chain of possession and is sufficient foundation to permit its introduction into evidence.[43]

The record shows the evidence was first collected at McKee's apartment by Queen and crime laboratory personnel. A crime laboratory technician brought the items from the duffelbag, including the maroon tank top and the black pants, to the police crime laboratory and packaged each item individually. Queen testified that he was present when the items were booked into property pursuant to Omaha police protocol. Hinsley then checked the maroon tank top out of property and delivered it, in accordance with police protocol, to UNMC

---

[41] See *State v. Nolan*, 283 Neb. 50, 807 N.W.2d 520 (2012).

[42] *State v. Glazebrook*, 282 Neb. 412, 803 N.W.2d 767 (2011).

[43] *State v. Mather*, 264 Neb. 182, 646 N.W.2d 605 (2002).

for DNA testing; Helligso documented receiving the tank top. After DNA testing was complete, Hinsley retrieved the evidence. There is no record that the black pants were ever removed from law enforcement custody.

We do not know who placed the exhibits into plastic, or when he or she did so. However, the sequence of events above provides a consistent chain of custody from initial collection until, presumably, the final transfer of the evidence to police property before trial.

In addition, both Helligso and Carter testified that the items were what the State purported them to be. The crime laboratory technician testified that other than some predictably lower visibility of bloodstains on the black pants, the items looked the same as when she saw them in September 2013.

In light of this evidence, it was not an abuse of discretion for the district court to admit exhibits 291 and 292. Therefore, Grant's ninth assignment of error is without merit.

## 8. Denial of Motions for Mistrial

In Grant's 10th assignment of error, he argues the district court erred by denying Grant's two motions for mistrial. Grant moved for mistrial on the sixth and seventh days of trial, after his violent outbursts in the courtroom.

### (a) Standard of Review

[24] Decisions regarding motions for mistrial are directed to the discretion of the trial court, and will be upheld in the absence of an abuse of discretion.[44]

### (b) Analysis

[25] The district court properly denied Grant's motions for mistrial. A mistrial is properly granted in a criminal case where an event occurs during the course of a trial which is of such a nature that its damaging effect cannot be removed by

---

[44] *Sturzenegger v. Father Flanagan's Boys' Home*, 276 Neb. 327, 754 N.W.2d 406 (2008).

proper admonition or instruction to the jury and thus prevents a fair trial.[45]

In *State v. Blackwell*,[46] we upheld the denial of a motion for mistrial where a defendant's outbursts had caused the alleged prejudice. In *Blackwell*, the defendant had, on two separate occasions, stood during examination of witnesses and yelled, disrupting the proceedings. We held that a defendant's own conduct affords no basis for a new trial.

[26] A defendant faces a higher threshold than merely showing a possibility of prejudice when attempting to prove error predicated on the failure to grant a mistrial. Instead, the defendant must prove the alleged error actually prejudiced him or her, rather than creating only the possibility of prejudice.[47]

On the sixth day of Grant's trial, outside the presence of the jury, Grant struck a deputy. Jurors were questioned after the incident about whether they had perceived any of what occurred. Five jurors had witnessed law enforcement running in response to radio calls. Though two jurors thought that the incident might have had something to do with Grant's case, none had any idea what had actually occurred. Further, when the district court asked some of the jurors if they could remain fair and impartial, they all responded that they could.

On the seventh day of trial, this time in the presence of the jury, Grant stood up suddenly and punched his counsel in the head. According to Steenbock's offer of proof testimony, the district court signaled to the bailiff, sheriffs punched Grant, a county attorney yelled "'[t]ase him,'" and a juror yelled "stop it." After trial began again, the court admonished the jury and asked jurors to notify the court if they could no longer remain fair and impartial. None did.

Grant attempts to distinguish *Blackwell* by arguing that the reactions of others in the courtroom were independent causes

---

[45] *State v. Dixon*, 286 Neb. 334, 837 N.W.2d 496 (2013).

[46] *State v. Blackwell*, 184 Neb. 121, 165 N.W.2d 730 (1969).

[47] *Dixon, supra* note 45.

of prejudice. We reject this argument. None of the reactions by counsel, the judge, the bailiff, the sheriffs, or the jurors would have occurred without Grant's own outburst. Accepting Grant's distinction would render the rule from *Blackwell* meaningless and permit a defendant to benefit from his or her own bad behavior during trial.

Furthermore, Grant has not shown that any prejudice resulted from the incidents. First, the jurors never learned what had occurred on the sixth day of trial. Additionally, the district court admonished the jury on both occasions. Finally, the jurors indicated they could remain fair and impartial after each incident.

Grant's 10th assignment of error is without merit.

### 9. Denial of Motion for Psychological Evaluation

In Grant's 11th assignment of error, he argues that the district court erred by denying his counsel's request for a short recess and for a second psychological evaluation.

#### (a) Standard of Review

[27] The trial court's determination of competency will not be disturbed unless there is insufficient evidence to support the finding.[48]

#### (b) Analysis

[28,29] The means to be employed to determine competency or the substantial probability of competency within the foreseeable future are discretionary with the district court, and the court may cause such medical, psychiatric, or psychological examination of the accused to be made as he or she deems necessary in order to make such a determination under Neb. Rev. Stat. § 29-1823(1) (Reissue 2008).[49] A person is

---

[48] *Walker, supra* note 6.

[49] *State v. Jones*, 258 Neb. 695, 605 N.W.2d 434 (2000).

competent to plead or stand trial if he or she has the capacity to understand the nature and object of the proceedings against him or her, to comprehend his or her own condition in reference to such proceedings, and to make a rational defense.[50] A defendant's derangement or lack of mental ability is not sufficient to prove incompetence to stand trial.[51]

In support of Grant's motion, defense counsel submitted an affidavit averring that a member of Grant's family and Carter suggested Grant suffered from mental illness. The affidavit further stated that Grant had become paranoid during trial and that at one point, Grant had even ceased wanting to discuss the trial because he predicted that the world would end before trial began. Counsel argued that Grant had become incompetent during the course of trial, at some point after his initial evaluation. However, the district court found that counsel's affidavit was insufficient to overcome the findings of the pretrial evaluation. Implicit in this finding, the district court concluded that another psychological evaluation was not required to determine Grant's continuing competency to stand trial.

There was sufficient evidence to support the district court's finding. The initial psychological evaluation found Grant competent beyond question. The evaluation even took into account Grant's past experience taking medication normally used to treat mental illness.

Further, counsel's affidavit and Grant's behavior during trial did not truly raise questions about Grant's ability to understand the nature of the proceedings, his place in them, or to participate in his defense. In this case, Grant's mere impulsive behavior during trial is not sufficient to raise the issue of incompetence.

Therefore, Grant's 11th assignment of error is without merit.

---

[50] *State v. Dunkin*, 283 Neb. 30, 807 N.W.2d 744 (2012).

[51] See *State v. Crenshaw*, 189 Neb. 780, 205 N.W.2d 517 (1973).

### 10. Cooper's Testimony
### and Objection

In Grant's 12th assignment of error, he asserts that the district court violated his constitutional rights by refusing to force Cooper to testify at the hearing on the seventh day of trial and by permitting Cooper to object to Steenbock's testimony. Steenbock's testimony was offered in support of Grant's second motion for a mistrial and the motion for a recess and psychological evaluation.

### (a) Standard of Review

[30] In Nebraska, a trial judge has broad discretion over the conduct of a trial.[52]

### (b) Analysis

Although the events of the hearing on the seventh day of trial were curious, they do not appear to have deprived Grant of any constitutional right. Any error in the district court's conduct of the hearing was harmless. As discussed above under subheadings 8 and 9, the motions for mistrial and psychological evaluation on the seventh day of trial were without merit. The introduction of Cooper's statements offered in support of Grant's motions would not have had any impact on the propriety of the district court's rulings. Thus, the exclusion of Cooper's statements was harmless.

For these reasons, Grant's 12th assignment of error is without merit.

### 11. Intentional Manslaughter
### Jury Instruction

In Grant's 13th assignment of error, he argues that the jury instruction for intentional manslaughter violated his due process rights. Grant asserts that the language "without malice" should have been removed from the jury instruction.

---

[52] *Pangborn, supra* note 13.

(a) Standard of Review

[31] Whether jury instructions are correct is a question of law, which an appellate court resolves independently of the lower court's decision.[53]

(b) Analysis

[32] When instructing the jury, it is proper for the court to describe the offense in the language of the statute.[54] Under Nebraska statute, "[a] person commits manslaughter if he or she kills another **without malice** upon a sudden quarrel . . . ."[55] In *State v. Cook*,[56] we affirmed a conviction for first degree murder where the jury was instructed to find manslaughter if "the killing was done 'upon a sudden quarrel' and 'without malice.'" Jury instruction No. 7 in the present case defined intentional manslaughter the same way as the trial court had in *Cook*.

Grant gives no argument why our law defining intentional manslaughter should be found unconstitutional. Thus, we apply our existing jurisprudence and hold that the district court did not err by giving jury instruction No. 7.

Grant's 13th assignment of error is without merit.

12. Insufficiency of Evidence

Finally, Grant assigns that his convictions were not supported by sufficient evidence.

---

[53] *State v. Stricklin*, 290 Neb. 542, 861 N.W.2d 367 (2015).

[54] *State v. Kass*, 281 Neb. 892, 799 N.W.2d 680 (2011).

[55] Neb. Rev. Stat. § 28-305 (Reissue 2008) (emphasis supplied).

[56] *State v. Cook*, 244 Neb. 751, 756, 509 N.W.2d 200, 204 (1993) (citing Neb. Rev. Stat. § 28-305(1) (Reissue 1989)). See, also, *State v. Smith*, 282 Neb. 720, 806 N.W.2d 383 (2011) (holding that intentional killing committed upon sudden quarrel without malice is manslaughter; overruling *State v. Jones*, 245 Neb. 821, 515 N.W.2d 654 (1994), which had found that manslaughter was not intentional crime).

### (a) Standard of Review

[33] When reviewing for sufficiency of the evidence to sustain a conviction, the relevant question for an appellate court is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.[57]

### (b) Analysis

Grant does not explain which essential elements of the crimes charged he believes were unproven. Instead, he raises concerns about the missing hair evidence, the number of surfaces not tested for DNA or fingerprints, and the fact that none of the law enforcement officials who saw Grant on September 17, 2013, noticed the drop of blood on his right shoe until the shoe was removed for evidence.

Logically, none of the concerns Grant raises necessarily create reasonable doubt. Just because more evidence could have been gathered does not mean that the evidence actually obtained was insufficient.

Taken in the light most favorable to the State, a reasonable juror could find every element of the crimes of which Grant was convicted. The elements of first degree murder, as given to the jury, were that (1) Grant killed McKee on September 17, 2013; (2) in Douglas County, purposely; (3) with deliberate and premeditated malice; and (4) not as a result of a sudden quarrel.

As discussed above, a reasonable juror could find beyond a reasonable doubt that Grant was the person who killed McKee. DNA evidence and Carter's testimony linked the maroon tank top, Adidas sneakers, and Nike sneakers to Grant. DNA testing suggested that the blood on each of these items was McKee's. Additionally, there was no sign of forced entry to the apartment, a juror could infer from Carter's testimony

---

[57] *State v. Draganescu*, 276 Neb. 448, 755 N.W.2d 57 (2008).

that the door was locked from the outside after the killer left the apartment, and there was no sign that any valuables had be stolen. This evidence implicates Grant very strongly, because he had access to the apartment and the murder seems to have been personally motivated. Further, Grant's "'almost single'" T-shirt had been placed in Carter's bedroom as if to taunt her. Finally, Grant exhibited a consciousness of guilt when he attempted to sneak onto a bus to Chicago and then gave Partridge and Checksfield false information in order to avoid arrest. All of this evidence strongly incriminates Grant and supports the conviction.

Furthermore, because McKee was stabbed over 50 times with "a great deal of force," a reasonable juror could find beyond a reasonable doubt that Grant killed McKee deliberately and maliciously. One neighbor's testimony that there was a pause between the argument and the screaming could be the basis for a reasonable juror to find that McKee's murder was premeditated and that it was not upon a sudden quarrel. There is no dispute that McKee was killed on September 17, 2013, in Douglas County. Furthermore, sufficient evidence supports Grant's conviction for use of a deadly weapon to commit a felony, because the murder was clearly committed with a knife.

Therefore, the State presented sufficient evidence and Grant's 14th assignment of error is without merit.

## V. CONCLUSION

Grant's convictions and sentences are affirmed.

AFFIRMED.