IN THE NEBRASKA COURT OF APPEALS

**MEMORANDUM OPINION AND JUDGMENT ON APPEAL**
**(Memorandum Web Opinion)**

STATE V. HECKARD

NOTICE: THIS OPINION IS NOT DESIGNATED FOR PERMANENT PUBLICATION
AND MAY NOT BE CITED EXCEPT AS PROVIDED BY NEB. CT. R. APP. P. § 2-102(E).

STATE OF NEBRASKA, APPELLEE,

V.

CHARLES J. HECKARD, JR., APPELLANT.

Filed January 29, 2019.    No. A-17-1131.

Appeal from the District Court for Douglas County: LEIGH ANN RETELSDORF, Judge. Affirmed.

Beau G. Finley, of Law Offices of Beau Finley, P.C., L.L.O., for appellant.

Douglas J. Peterson, Attorney General, Derek T. Bral, Senior Certified Law Student, and, on brief, Sarah E. Marfisi for appellee.

PIRTLE, BISHOP, and ARTERBURN, Judges.

BISHOP, Judge.

## I. INTRODUCTION

After a jury trial, the Douglas County District Court convicted Charles J. Heckard, Jr., of burglary. The district court found Heckard was a habitual criminal as defined by Neb. Rev. Stat. § 29-2221 (Reissue 2016); Heckard was sentenced to 10 to 12 years' imprisonment. On appeal, Heckard challenges his conviction on a number of grounds and asserts he received ineffective assistance of trial counsel. We affirm, and we conclude his ineffective assistance claim cannot be resolved on direct appeal.

## II. BACKGROUND

### 1. Proceedings Prior to Trial

In November 2013, the State filed an information in the district court charging Heckard with one count of felony burglary involving conduct on October 9 at a residence located on South 37th Street in Omaha, Nebraska. In an amended information filed in June 2014, the State added an allegation that Heckard was a habitual criminal.

Heckard subsequently filed a motion to suppress and exclude from use against him all his statements to officers on October 9, 2013, arguing that the evidence was obtained in violation of the 5th Amendment of the U.S. Constitution and Article I, Section 12 of the Nebraska Constitution. He alleged his statements were the "fruits of a custodial interrogation" and not voluntarily or knowingly made, and were given without advisement of his rights or a proper waiver of his rights. He asserted his statements were (1) the result of words or actions of the police that the police should have known were reasonably likely to elicit an incriminatory response and (2) the "product of threats, coercion, deception, and/or inducements" of the police. After a hearing on the matter, the district court entered an order denying the motion; the factual findings in that order are discussed as relevant below.

### 2. Trial

Trial by jury took place from December 1 to 3, 2014.

#### (a) State's Witnesses

The State called several witnesses; relevant portions of their testimony are summarized below.

##### (i) Mark Johnson

Mark Johnson, a housing inspector for the Omaha Planning Department for 13 years, was familiar with the residence on 37th Street. He said he was first there around 2005 or 2006, responding to a housing complaint to inspect a basement apartment and the residence's exterior.

Johnson estimated he had done an exterior inspection of the residence about 1 or 2 months prior to October 9, 2013, and that it "would have been months" before that day that he had done an inside inspection. During that inside inspection, he noticed the items within the home, including two stoves and an air-conditioner on the second floor and sinks in the basement. In the exterior inspection of the residence prior to October 9, he had not noted broken windows, doors, or screens, fallen soffits, deteriorated roofing, "bad" gutters, or property or debris in the yard. Johnson had known the residence "had been vacant for so long" and would drive by the residence "[p]robably once a week, sometimes more." He was driving by the residence on October 9 and his attention was drawn to the residence. As he drove by, he noticed a "white pickup at the back part of the driveway." The driveway apparently extended to the back of the house with a large parking area in the back. Johnson backed up and saw "two black males carry[] an air-conditioner and put it into the back of the pickup truck." He remembered the property manager, Roger Hale, had an office "a block away" and thought he would go ask if Hale "had people there cleaning the property out." After Johnson's conversation with Hale, Johnson called "911."

Johnson returned to the residence and went to the back of the residence after he saw officers were handcuffing the two men. He inspected items that were in the back of the white pickup and recognized the sink, air-conditioner, and stove as having come from inside the residence. Johnson also observed another sink "inside of the back door." He said there were two doors in the back of the residence: "one to the main floor and a set of stairs and a door to the second floor." He noticed those doors were open. He said that in prior inspections of that property, he "always checked that [those doors] were secure." Johnson estimated the property became vacant in "2007 or '8," but that he had not had any telephone calls about the residence in 2013 reporting broken windows, open doors, or debris in the yard.

### (ii) Officer Rickey Brown

Officer Rickey Brown, a police officer with the City of Omaha for 13 years, received a "[b]urglary in progress" call to the 37th Street residence on October 9, 2013. He reached the location within 3 to 5 minutes, and saw another officer (his partner) in the driveway talking to two men. (Officer Brown later identified the two men as General Swayzer and Heckard.) Officer Brown walked over to the two men and asked them "what's going on here, what are you guys doing here?" As to the State's question of what Heckard said in response, Heckard renewed his motion to suppress and was again overruled. Officer Brown then testified that Heckard's response to his question was that "they were scrapping." Officer Brown asked followup questions to which Heckard apparently answered that they "were taking the stuff out of the yard, you know, scrap metal" and "they had not been inside [the residence]."

Officer Brown observed the white pickup truck and noticed "the back of the truck had lots of stuff in it," the "back door to the house was open on the ground level" with a sink in the doorway, and there was "a similar sink in the bed of the truck." He went inside the house and saw "the back door, the top [second] floor, was open as well and windows [in the back of the house] were either kicked out or broken out." Officer Brown took Heckard and Swayzer into custody and turned Heckard over to the Criminal Investigation Bureau. He said two other officers, besides himself and his partner, had "responded" to the location.

### (iii) Rebecca Learned

Rebecca Learned, a crime lab technician with the Omaha Police Department Crime Lab for 4 years, testified that she was working in that capacity on October 9, 2013. That day, she went to the 37th Street residence on notification of a burglary scene requiring crime lab services. When she arrived, among other things, Learned photographed the scene, processed areas for fingerprints (she was unable to obtain any fingerprints from the two rear doors), and collected items of evidence.

### (iv) Roger Hale

Hale, lead property manager of single-family houses for a real estate company, became familiar with the owner of the 37th Street residence in 2012 and was tasked with securing, maintaining, and stabilizing that property for possible liquidation. Hale said it would be inspected on the inside "at least every four weeks" and the exterior "at a minimum once a week." Prior to October 9, 2013, he had last inspected the property in mid-September; he met with one of the

company's maintenance technicians to get access to do a walk-through as "all points of entry were secured." Inside the house, he had observed, among other things, an air-conditioning unit as well as some sinks and other kitchen appliances in the basement. Apparently, all three doors had "entry handles" that were "keyed to a master" and had dead bolts. All the windows on the first and second floors had a "locking mechanism" so the windows could not be raised from the outside. All points of entry were boarded up with plywood and a "special screw"; he clarified that windows were not boarded up, but entries to doors or "side lights for doors" are boarded up, and he explained the plywood went across the doors "[f]rom the inside." After the mid-September inspection, he and the maintenance technician "placed the plywood back on and resecured the house" when they left. The last time Hale had done "an exterior walk" of the property prior to October 9 was "the Saturday prior" (October 5) and that there were no problems with the entry points, no broken windows, and no items in the yard.

On October 9, 2013, Hale went to the residence because he was "informed that there were people that were not affiliated with [his] firm" on site at that time. When he arrived, he found a vehicle that "was not supposed to be there." He had recognized "the AC [air-conditioning] unit and the stove," that were in the back of a truck as coming from inside the house. He then started to approach the house, which is when he observed "a gentleman who was backing out of [the first-floor door]" carrying something. He described that individual as an "African-American male, five-eight, five-nine, probably 180, 190 pounds." Hale approached that man and that man proceeded to "turn and talk to someone facing him [who was] still inside the house." Hale said the man then turned to start walking to Hale after putting down a sink and explained he "had permission and he was just trying to do some neighborhood cleanup." Once Hale realized "there was someone inside the house," Hale started backing up. At that time, allegedly "the other fellow" came walking "out of the house." Hale described this second individual as an "African-American male, larger than the first fellow, six-one, six-two, probably 230, 240 as far as pounds." Hale proceeded to walk down the driveway toward 37th Street, and then "about five police cruisers" showed up.

Hale said that as manager he would know who had permission to be at the house, and that he had not given either individual such permission. He said the owner of the property was "in hospice" at the time (of the incident) and that during Hale's management of the property from 2012 until the owner "passed" in 2013, the owner had never gone to the house. Hale said the maintenance technician designated for the property had never gone to a property or done anything at a property that Hale managed that Hale had not approved. Prior to October 9, 2013, Hale had not had to "go in [the property] and resecure damaged doors."

*(v) Detective William Seaton*

Detective William Seaton was a police officer with the City of Omaha assigned as a detective. He conducted the interview of Heckard, one of the two parties brought to the police station for questioning in connection with a "burglary call" on October 9, 2013.

(b) Circumstances of Heckard's Absence During Trial

After Detective Seaton's testimony on December 2, 2014 (second day of trial), the district court declared an early lunch break be taken and instructed the parties and jury to return at 12:45

p.m. Recess was taken at 11:32 a.m. and at 1:30 p.m., outside the presence of the jury, counsel for the parties appeared but Heckard was not personally present. The district court stated, "Heckard was told to return to the courtroom at 12:45 [p.m.] after the lunch recess. We've waited 45 minutes for him and he has not shown up." The court said it would issue a warrant for Heckard's arrest and continued trial to the following morning at 9 a.m.

The next morning at 9:20 a.m., trial resumed and Heckard did not personally appear. Heckard's counsel had no information to provide regarding Heckard's "whereabouts." With the jury not present, the State called Officer Robert Laney to testify about efforts made to locate Heckard since adjournment the prior day, which testimony will be discussed as relevant below. The district court found that Heckard voluntarily chose not to be present and there was no additional information to suggest otherwise. It noted the absence of evidence of coercion or threats upon Heckard that he not appear. Heckard's counsel objected to the "ruling of voluntariness" and moved for a mistrial; both were overruled. This was followed by a jury instruction conference with counsel. Back in the presence of the jury, the State rested its case without producing further evidence, the defense offered no evidence, and closing arguments were made. The jury verdict proceedings were held in Heckard's absence that day.

### 3. JURY VERDICT AND CONVICTION, HABITUAL CRIMINAL ENHANCEMENT, AND SENTENCING

On December 3, 2014, the jury found Heckard guilty of burglary, upon which the district court entered a conviction. In a filing the next day, the district court noted the day of sentencing was "to be set upon arrest," finding that Heckard "failed to appear" and indicating a warrant had been issued.

The enhancement hearing on the habitual criminal charge occurred almost 3 years later in September 2017; Heckard had filed several pro se motions in August that the district court overruled at that hearing. According to an order entered in September, the district court found Heckard was guilty beyond a reasonable doubt of the habitual criminal count and ordered he be deemed as such for his sentencing. After a sentencing hearing on October 18, the district court sentenced Heckard on his burglary conviction to 10 to 12 years' imprisonment with 214 days' credit for time served.

### 4. MOTION FOR NEW TRIAL AND APPEAL

Heckard filed a "Motion for New Trial" in September 2017, requesting the district court vacate and set aside his burglary conviction. He argued that he was not personally present "for a portion of his jury trial and for the verdict," as allegedly statutorily required in a felony trial, and that proceeding with trial in his absence affected his substantive rights and prevented a fair trial. On October 30, the district court entered an order overruling Heckard's motion for new trial.

Heckard timely appealed.

### III. ASSIGNMENTS OF ERROR

Heckard claims, reordered and restated, that the district court erred in (1) overruling his motion to suppress, (2) proceeding with the jury trial without his presence, and (3) refusing to give

his proposed jury instruction; he also claims (4) the evidence was insufficient to support his burglary conviction and (5) he received ineffective assistance of trial counsel.

## IV. STANDARD OF REVIEW

Whether a defendant voluntarily made a statement while in custody and whether a defendant unambiguously invoked his or her right to remain silent or to have counsel present are mixed questions of law and fact. *State v. Hernandez*, 299 Neb. 896, 911 N.W.2d 524 (2018). We review a trial court's finding of historical facts for clear error and independently determine whether those facts satisfy the constitutional standards. *Id*.

When dispositive issues on appeal present questions of law, an appellate court has an obligation to reach an independent conclusion irrespective of the decision made by the court below. *State v. Zlomke*, 268 Neb. 891, 689 N.W.2d 181 (2004).

Whether jury instructions are correct is a question of law, which an appellate court resolves independently of the lower court's decision. *State v. Swindle*, 300 Neb. 734, 915 N.W.2d 795 (2018).

In reviewing a criminal conviction for a sufficiency of the evidence claim, whether the evidence is direct, circumstantial, or a combination thereof, the standard is the same: An appellate court does not resolve conflicts in the evidence, pass on the credibility of witnesses, or reweigh the evidence; such matters are for the finder of fact. The relevant question for an appellate court is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *State v. Golyar*, 301 Neb. 488, 919 N.W.2d 133 (2018).

Whether a claim of ineffective assistance of trial counsel can be determined on direct appeal presents a question of law, which turns upon the sufficiency of the record to address the claim without an evidentiary hearing or whether the claim rests solely on the interpretation of a statute or constitutional requirement. *Id*. We determine as a matter of law whether the record conclusively shows that (1) a defense counsel's performance was deficient or (2) a defendant was or was not prejudiced by a defense counsel's alleged deficient performance. *Id*.

## V. ANALYSIS

### 1. MOTION TO SUPPRESS

Heckard claims the district court erred in denying his motion to suppress. He generally asserts (1) his initial statements to Officer Brown constituted a custodial interrogation without advisement of his rights pursuant to *Miranda v. Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966) (*Miranda* rights) and (2) his later statements to Detective Seaton were obtained as a result of the prior violation of his rights, because Detective Seaton's advisement of *Miranda* rights at the interview was insufficient to purge the taint of the prior violation. He argues both of his statements to law enforcement were inadmissible.

The U.S. Supreme Court held in *Miranda v. Arizona, supra*, that in order to safeguard the uncounseled individual's Fifth Amendment privilege against self-incrimination, suspects interrogated while in police custody must be told that they have the right to remain silent, that anything they say may be used against them in court, and that they are entitled to the presence of

an attorney, either retained or appointed, at the interrogation. See *State v. Burdette*, 259 Neb. 679, 611 N.W.2d 615 (2000). *Miranda* warnings are not required for general on-the-scene questioning as to facts surrounding a crime. See *State v. Landis*, 281 Neb. 139, 794 N.W.2d 151 (2011). However, such warnings are an absolute prerequisite to custodial interrogation; statements made during a custodial interrogation in the absence of these warnings and a valid *Miranda* waiver are inadmissible, even if otherwise voluntarily made. See *State v. Hernandez, supra*.

The relevant inquiry in determining "custody" for purposes of *Miranda* rights is whether, given the objective circumstances, a reasonable person would have felt he or she was not at liberty to terminate the interaction and leave. *State v. Grant*, 293 Neb. 163, 876 N.W.2d 639 (2016). See, also, *State v. Landis, supra* (person is in custody when there is a formal arrest or restraint on one's freedom of movement to degree associated with an arrest). Next, "interrogation" under *Miranda v. Arizona, supra*, refers not only to express questioning, but also to any words or actions on the part of the police that the police should know are reasonably likely to elicit an incriminating response from the suspect. *State v. Grant, supra*.

The Nebraska Supreme Court has identified circumstances most relevant to the custody inquiry: (1) the location of the interrogation and whether it was a place where the defendant would normally feel free to leave; (2) whether the contact with the police was initiated by them or by the person interrogated, and, if by the police, whether the defendant voluntarily agreed to the interview; (3) whether the defendant was told he or she was free to terminate the interview and leave at any time; (4) whether there were restrictions on the defendant's freedom of movement during the interrogation; (5) whether neutral parties were present at any time during the interrogation; (6) the duration of the interrogation; (7) whether the police verbally dominated the questioning, were aggressive, were confrontational, were accusatory, threatened the defendant, or used other interrogation techniques to pressure the suspect; and (8) whether the police manifested to the defendant a belief that the defendant was culpable and that they had the evidence to prove it. See *State v. Rogers*, 277 Neb. 37, 760 N.W.2d 35 (2009).

Our analysis of Heckard's interaction with Officer Brown is dispositive regarding whether Heckard was in custody. The district court's factual findings, which are not clearly erroneous, discussed how Officer Brown responded to a "'burglary in progress'" dispatch, and on his arrival "a couple minutes after the dispatch," Officer Brown observed another officer speaking with two men (one of whom was Heckard) in the driveway of a residence. Officer Brown approached them and asked Heckard, "'what are you doing here'"; Heckard responded they were "'scrapping.'" Officer Brown stated it was closed property and Heckard indicated they were scrapping in the yard but did not go in the house. Officer Brown then had contact with a city inspector and property manager, and Officer Brown investigated behind the residence. Officer Brown returned to the front of the residence and Heckard and the codefendant were placed under arrest.

The facts do not show Heckard was told he could terminate the questioning and leave or that there were neutral parties present during the interaction. While these factors may suggest Heckard was in custody, other considerations outweigh that conclusion.

Questioning in the driveway of a residence, described by the district court as "an open public place," is a place a reasonable person would normally feel free to leave. Further, Heckard concedes "there may have been no 'strong arm' tactics used by law enforcement," but argues "the atmosphere was certainly police dominated" as Heckard was questioned "by two different officers

- 7 -

simultaneously." Brief for appellant at 16. But, the presence of a second officer or even multiple officers does not require the conclusion that Heckard was under arrest or that he was not free to leave. See *State v. Landis, supra*. The district court found "the questioning was not extensive and the questions were straight forward and related to an immediate need to ascertain some information." Even if Heckard was questioned simultaneously by Officer Brown and another officer, the facts do not suggest the officers used threats of force or coercion during the questioning; Heckard simply responded voluntarily. See *State v. Landis, supra* (where police officers use no coercion or threat of force and any continued detention is at suspect's consent, warnings of *Miranda* rights are not required).

Moreover, the district court found Officer Brown testified that when he arrived he observed the two men, including Heckard, being "'detained'" by the other officer and that although Heckard had not been told he was under arrest or placed in handcuffs, Officer Brown believed Heckard was at least a trespasser and would likely be arrested for that offense. That Officer Brown thought Heckard was being detained by the other officer and that Heckard would likely be arrested for an offense is irrelevant to our analysis because the record does not show such thoughts were communicated to Heckard during the interaction. See, *Yarborough v. Alvarado*, 541 U.S. 652, 124 S. Ct. 2140, 158 L. Ed. 938 (2004) (policeman's unarticulated plan has no bearing on whether suspect was in custody at a particular time); *State v. Rogers, supra* (relevant inquiry is whether police manifested to defendant a belief that defendant was culpable and that police had evidence to prove it). And Heckard had not been told he was under arrest or handcuffed at the time of questioning; no evidence refuted the absence of restrictions on his freedom of movement at that time.

Given the noted pertinent considerations, we conclude that a reasonable person in Heckard's position would have felt free to terminate the interaction with Officer Brown and leave. See, *State v. Rogers, supra*; *State v. Grant, supra*; *State v. Landis, supra*. Accordingly, no advisement of *Miranda* rights was necessary at that time and any statements from that interaction were admissible at trial. It follows that there was no "taint," brief for appellant at 19, of a constitutional violation to be purged from Heckard's interaction with Officer Brown that could have affected his subsequent interview with Detective Seaton at police headquarters.

Finally, as noted by the State, even if it could be concluded that Heckard was in custody when he made statements to Officer Brown, the admission of those statements would nevertheless constitute harmless error. The admission of an improperly obtained statement is a trial error, and so its erroneous admission is subject to harmless error analysis. *State v. Bauldwin*, 283 Neb. 678, 811 N.W.2d 267 (2012). Harmless error review looks to the basis on which the trier of fact actually rested its verdict; the inquiry is not whether in a trial that occurred without the error a guilty verdict would surely have been rendered, but, rather, whether the actual guilty verdict rendered in the questioned trial was surely unattributable to the error. *Id*. It is the appellate court's duty to review the whole record and determine whether the jury's verdict was surely unattributable to the error. See *id*. We agree with the State that the jury's verdict in this case could not be attributable to Heckard's statements. As the State points out, Heckard's statement that they were "scrapping" was not evidence upon which the jury would have based its guilty verdict, because even without Heckard's statements, "the evidence against him was overwhelming." Brief for appellee at 18. Hale observed the two men (which included Heckard) inside the home carrying items out to the

truck and recognized items in the back of the truck as coming from inside the house. There was evidence of damaged doors and a window kicked out or broken, and there was no evidence Heckard had permission to be in the home or to remove items from it. Heckard's statements that they were "scrapping" or "were taking the stuff out of the yard, you know, scrap metal" and "they had not been inside [the residence]" were not admissions that he was burglarizing the home. None of these statements could be construed as incriminating Heckard for burglary, and when considering these statements in the context of the other incriminating evidence (described in more detail in our discussion of the sufficiency of the evidence), it is clear that the jury's verdict was surely unattributable to Heckard's statements, whether erroneously admitted or not.

## 2. DEFENDANT'S ABSENCE DURING JURY TRIAL

Heckard claims it was erroneous for the district court to proceed with the jury trial in his absence. Heckard argues a plain reading of Neb. Rev. Stat. § 29-2001 (Reissue 2016) (statutory right of accused to be present during trial) "would lead one to logically conclude that presence in a felony trial simply cannot be waived." Brief for appellant at 20. He asserts the Legislature has prescribed a procedure for waiving one's presence in misdemeanor matters, but not for felony charges.

Section 29-2001 provides:

No person indicted for a felony shall be tried unless personally present during the trial. Persons indicted for a misdemeanor may, at their own request, by leave of the court be put on trial in their absence. The request shall be in writing and entered on the journal of the court.

Heckard essentially requests that this court reject longstanding precedent of the Nebraska Supreme Court that a defendant accused of a felony may effectively waive his or her presence at trial if such waiver is knowing and voluntary. See, *Scott v. State*, 113 Neb. 657, 204 N.W. 381 (1925) (interpreting prior codification of § 29-2001 that said no person indicted for felony shall be tried unless personally present during trial; in felony case, not capital, defendant out on bail may waive right to be present at trial during some proceedings); *State v. Red Kettle*, 239 Neb. 317, 476 N.W.2d 220 (1991) (mentioning § 29-2001; defendant's waiver of his presence at trial was knowing and voluntary); *State v. Zlomke*, 268 Neb. 891, 689 N.W.2d 181 (2004) (mentioning § 29-2001; defendant with three felony charges was knowingly and voluntarily absent from second day of trial and day trial was scheduled to continue); *State v. Fox*, 282 Neb. 957, 806 N.W.2d 883 (2011) (mentioning § 29-2001; defendant knowingly and voluntarily waived his right to be present during portions of his murder trial).

The cited precedent, which was decided in light of the language of § 29-2001, controls our analysis here. We note the Legislature has not amended the disputed language in response to those cases; the statute was amended, effective July 2018, only to substitute the word "record" for "journal," and prior to that, it had last been amended in 1929. See § 29-2001. Further, the statute as interpreted in the cited precedent achieves the Nebraska Supreme Court's stated policy that the law does not allow a defendant to prevent the completion of trial by voluntarily absenting himself, because to do so would tie the hands of justice and permit the defendant to take advantage of his own wrong. See *Scott v. State, supra*.

Heckard was personally present for the first day of trial (December 1, 2014) and the morning session of the second day of trial (December 2). Since Heckard was personally present for the morning session of trial on December 2, he would have heard the district court's instruction that trial was to resume at 12:45 p.m. Heckard failed to return. Because of his absence, the district court continued trial to the following morning. The next morning when Heckard again did not appear, the State called Officer Robert Laney, a police officer for the City of Omaha assigned to the fugitive unit. He testified outside the presence of the jury that he started to try to locate Heckard the prior day around "2:15 or 2:30 [p.m.]." He researched several databases to check for anything that could reveal Heckard's location. He found Heckard was not in jail in either Nebraska or Iowa; Heckard had not worked or been paid, according to his Social Security number, since 2013; and no vehicle was registered to him. Officer Laney discovered Heckard's last known address, but he and several officers were unable to locate Heckard in a visit to that address. Officer Laney asked a resident of that address when she had last seen Heckard, and the resident responded she had seen him the morning "when he was coming to court" and assumed he was still at court; the resident apparently did not know any other address where Heckard could have been. Officer Laney asked the gang unit to see if Heckard would show up at the identified address and provided that unit with photographs of Heckard and the address; that unit did not locate Heckard. He checked "all of the jail systems" the next morning (the same morning he testified) and did not find Heckard in jail anywhere. When asked if he checked hospitals or medical facilities, Officer Laney responded that "they could not give me any information," apparently due to "HIPAA." The court proceeded to make a finding that Heckard "appears to have voluntarily chosen not to be present."

When trial resumed with the jury present, the State immediately rested and defense counsel offered no evidence. The jury was instructed to "draw no conclusions or inferences from the fact that [Heckard] was not present in Court. [Heckard's] absence is not in any way due to any actions or conduct of any of the parties."

We conclude that the record reflects that Heckard's absence was knowing and voluntary, and he therefore waived his right to be present for the remainder of his jury trial. See *State v. Zlomke, supra*. Even Heckard "concedes the [d]istrict [c]ourt in this case followed the procedures laid out" in *State v. Zlomke, supra*, and *State v. Red Kettle, supra*. Brief for appellant at 21-22. The district court did not err in proceeding with the trial in Heckard's absence.

### 3. JURY INSTRUCTIONS

Heckard claims the district court erred when it denied his request to incorporate his amendment to the sixth jury instruction, "which addressed the issue of a breaking being necessary elementally before a [d]efendant can be found guilty of [b]urglary." Brief for appellant at 27. As relevant, the sixth jury instruction stated:

> A "breaking" necessary to constitute the crime of burglary may be any act of physical force, however slight, by which the obstruction to entering is removed. The lifting of a hook with which a door is fastened, or the opening of a closed door, or removal of a window is "breaking." In addition to the use of physical force, however slight, the removal of an obstacle to entry is necessary to find a "breaking."

Heckard proposed that the instruction include the language: "Entry of an open door is not a breaking."

In an appeal based on a claim of an erroneous jury instruction, the appellant has the burden to show that the questioned instruction was prejudicial or otherwise adversely affected a substantial right of the appellant. *State v. Swindle*, 300 Neb. 734, 915 N.W.2d 795 (2018). All the jury instructions must be read together, and if, taken as a whole, they correctly state the law, are not misleading, and adequately cover the issues supported by the pleadings and the evidence, there is no prejudicial error necessitating reversal. *Id*. To establish reversible error from a court's refusal to give a requested instruction, an appellant has the burden to show that (1) the tendered instruction is a correct statement of the law, (2) the tendered instruction is warranted by the evidence, and (3) the appellant was prejudiced by the court's refusal to give the tendered instruction. *Id.*

Heckard argues that from the holding in *State v. McDowell*, 246 Neb. 692, 522 N.W.2d 738 (1994), "entry through an open door was specifically noted by the Supreme Court as a circumstance that does not constitute a breaking." Brief for appellant at 27. In that case, the Nebraska Supreme Court stated, "force alone is not enough to constitute a breaking. It takes physical force to walk through an open door . . . but no obstruction is removed; thus, there is no breaking." See *State v. McDowell,* 246 Neb. at 700, 522 N.W.2d at 744 (defendant's conviction was reversed; as matter of law there was no breaking, and therefore no burglary). We do not disagree with Heckard's statement that his proposed amendment is "a correct statement of law." Brief for appellant at 27. However, Heckard fails to prove prejudice as a result of the district court's refusal to give his proposed instruction.

A person commits burglary "if such person willfully, maliciously, and forcibly breaks and enters any real estate or any improvements erected thereon with intent to commit any felony or with intent to steal property of any value." Neb. Rev. Stat. § 28-507(1) (Reissue 2008). It is well settled that a breaking is an essential element of burglary. *State v. McDowell, supra*. Evidence of any act of physical force, however slight, by which the obstruction to entering is removed is sufficient to prove a breaking. See *id.* When burglary is charged, a jury should be instructed that in addition to the use of physical force, however slight, the removal of an obstacle to entry is necessary to find a breaking. *Id.* But, see, *State v. Greer*, 257 Neb. 208, 596 N.W.2d 296 (1999) (no plain error where jury instruction omitted language on removal of obstacle to entry).

The jury instructions adequately stated the required elements of the offense of burglary. The jury was instructed of the State's burden to "prove beyond a reasonable doubt" each of the following (listed as charged) "material elements necessary for conviction": (1) "on or about the 9th day of October 2013, in Douglas County, Nebraska, [Heckard], did break and enter into a building at [37th Street residence]"; (2) "such breaking and entering was done willfully, maliciously, and forcibly"; (3) "such breaking and entering was done with the intent to commit a felony or with the intent to steal property of value contained in such building"; and (4) "such breaking and entering was done without the consent or permission of [the residence's owner]." In addition to the disputed definition of breaking, the jury was provided meanings for: steal, willfully, maliciously, property, knowingly, and forcibly.

The definition of breaking in the jury instruction at issue included the precise language set forth in *McDowell* regarding use of physical force and removal of an obstacle to entry. See *State v. McDowell, supra*. While the State concedes "[w]hether Heckard had to remove an obstacle

before entering the home was certainly at issue," brief for appellee at 28, we cannot conclude the definition of breaking was prejudicial to Heckard. Heckard's proposed addition that "[e]ntry of an open door is not a breaking" would have been unnecessarily repetitive of the provided jury instruction that "the opening of a closed door . . . is 'breaking.'" The district court did not err in refusing to incorporate Heckard's proposed jury instruction, as all jury instructions read together correctly state the law, are not misleading, and adequately cover the issues supported by the pleadings and the evidence. See *State v. Swindle, supra*.

### 4. SUFFICIENCY OF EVIDENCE

Heckard claims there was insufficient evidence to convict him of burglary. As stated previously, a person commits burglary "if such person willfully, maliciously, and forcibly breaks and enters any real estate or any improvements erected thereon with intent to commit any felony or with intent to steal property of any value." § 28-507(1). Evidence of any act of physical force, however slight, by which the obstruction to entering is removed is sufficient to prove a breaking. See *State v. McDowell, supra*. For instance, the opening of a closed door is a breaking. *State v. McDowell, supra*. However, walking through an open door is not. *Id.*

While Heckard concedes "the State presented considerable evidence to support that a burglary occurred," brief for appellant at 23, he essentially argues he did not commit burglary because he did not have the requisite intent. He suggests Swayzer "may have told [Heckard]" that Swayzer had permission to be "on the property." *Id.* Heckard asserts his belief that "he had permission to be at the property" negates his intent to commit burglary, even if that belief "turned out to be erroneous." *Id.* at 25.

Viewing the evidence most favorably to the State, we find a rational trier of fact could have found beyond a reasonable doubt that Heckard had the requisite intent for a burglary conviction as inferred from the facts and circumstances of the illegal entry, despite Heckard's alleged belief. See *State v. Nero*, 281 Neb. 680, 798 N.W.2d 597 (2011) (intent sufficient to support burglary conviction may be inferred from facts and circumstances surrounding illegal entry).

Namely, Hale testified about how he had observed one man "backing out" of the property's first-floor door carrying something and how that man turned to talk to someone who was "still inside the house." According to Hale, the second individual to exit the house was an African-American male who was "six-one, six-two, probably 230, 240 [pounds]," which was similar to Officer Brown's description of Heckard as "six-three, 270, 280 [pounds]"; Officer Brown described Swayzer as "about five-eight, maybe 170 [pounds]." On the other hand, Officer Brown testified that Heckard had told him Heckard was scrapping in the yard and had not gone inside the house, and as heard on exhibit 36 (video of Detective Seaton's interview of Heckard), Heckard stated: "I didn't go in the house whatsoever."

On appeal, Heckard still "does not concede that he was in the house," but he acknowledges "the State did put forth evidence to suggest that he was [inside the house]." Brief for appellant at 24. Under our standard of review, an appellate court does not resolve conflicts in the evidence as such was a matter for the jury. See *State v. Golyar*, 301 Neb. 488, 919 N.W.2d 133 (2018). From the evidence restated above, a rational trier of fact could have resolved the conflict of whether Heckard was inside the house in the State's favor and further deduced that Heckard knew, during

the commission of the offense, that he did not have permission to be inside the house, yet entered anyway.

Additionally, the State put forth ample evidence to support that Heckard willfully, maliciously, and forcibly broke into the residence. Both Johnson and Hale discussed their separate, last inspections of the residence prior to October 9, 2013; their testimony generally conveyed that the residence's windows and doors were secure. Hale said that after his interior inspection in mid-September upon leaving the residence, he and the maintenance technician locked all of the locks, put barriers in place, and rescrewed the doors. Learned identified a series of photographs (exhibits 6 to 33) she took as accurate depictions of what the property in the photographs looked like that day. Learned described some of her photographs as showing "possible tool marks" to a storm door on the first-floor (exhibit 14), the sides of the wooden first-floor door (exhibit 16) and the second-floor door (exhibit 23), and the frame of the second-floor door (exhibit 25). Other photographs depicted "pieces of glass on the ground" to show "possible damage to the [basement] window" (exhibit 28), the "empty window frame" (exhibit 29), and "pieces of glass" at the bottom of the window (as viewed from inside the residence) (exhibit 32). Hale testified about exhibit 23 (close-up view of side of second-floor door) as the "damage" seen in the photograph not being there at the time of his exterior inspection (on October 5). To Hale's knowledge, nobody else was there that worked for him between that day and the incident.

Also, Learned said she recovered a pry bar and a crowbar from the residence, which were purportedly "from the bed of the white truck parked behind the residence" (photographic copies of that evidence were received at trial as exhibits 34 and 35). A rational deduction from the described and depicted tool marks to doors and damage to the window is that the recovered pry bar and crowbar, which Learned said came from the bed of the white truck (Officer Brown testified he had found the truck belonged to Swayzer) were used by Heckard to break and enter into the residence.

Moreover, there was plenty of evidence sufficient to rationalize that Heckard broke and entered the residence with intent to steal property. Johnson testified about how he had observed "two black males carry[] an air-conditioner and put it into the back of the pickup trunk." Johnson said that when he later inspected the items in the back of the white pickup, he recognized the sink, air-conditioner, and stove as having come from inside the residence (those items were allegedly inside the home during his last inspection prior to October 9, 2013). During Hale's last inspection prior to October 9, he had observed an air-conditioning unit, sinks, and other kitchen appliances; Hale later recognized the "AC [air-conditioning] unit" and a stove he observed in the back of the pickup truck as coming from inside the house. A rational deduction would have been that the items described as being in the back of a pickup truck in Johnson and Hale's testimony are the same items that are shown in Learned's photographs (exhibits 8 and 9) that depict the contents of items in the bed of the white truck.

The evidence, viewed and construed most favorably to the State, was sufficient to support the jury's conclusion that Heckard committed the offense of burglary as it is statutorily defined.

### 5. INEFFECTIVE ASSISTANCE OF COUNSEL

Heckard presents a claim of ineffective assistance of trial counsel. We first clarify who served as Heckard's trial counsel.

In an order filed in October 2017, the district court summarized proceedings related to Heckard's trial counsel:

> While pending sentencing, [Heckard] filed a motion requesting dismissal of the public defender [appointed to represent Heckard in this case pursuant to a court order entered November 22, 2013]. That motion was granted and [Heckard] was allowed to proceed pro-se [pursuant to a court order filed September 5, 2017]. [Heckard] also requested appointment of counsel outside the office of the public defender, however, the public defender cited no conflict at that time. On September 5, 2017, the public defender filed a motion for alternate counsel due to conflict . . . .

Such public defender's motion alleged there existed a conflict of interest between Heckard and the public defender's office as two assistant public defenders, April M. Lucas and Mikki C. Jerabek, who had been Heckard's trial counsel in this action, were "necessary witnesses" that could be called to testify in a separate action in which Heckard was represented by different counsel, Beau G. Finley. In the separate order filed September 5, the district court sustained the public defender's motion and appointed Finley as new counsel to represent Heckard in this action. Finley represented Heckard from that point forward for proceedings, including sentencing, and also represents Heckard on appeal and appears named as sole counsel on Heckard's appellate brief.

The record reflects that Finley is not affiliated with the public defender's office and that Finley did not participate in any pre-trial or trial proceedings that are pertinent to Heckard's ineffective assistance claim raised in this appeal: failure to call Swayzer as a witness at trial. Rather, the record shows Lucas and Jerabek as the trial counsel who represented Heckard at those relevant times, and therefore we address Heckard's ineffective assistance claim on this direct appeal only as it relates to representation provided by Lucas and Jerabek.

When a defendant's trial counsel is different from his or her counsel on direct appeal, the defendant must raise on direct appeal any issue of trial counsel's ineffective performance which is known to the defendant or is apparent from the record. *State v. Avina-Murillo*, 301 Neb. 185, 917 N.W.2d 865 (2018). Otherwise, the issue will be procedurally barred. *Id.*

Generally, to prevail on a claim of ineffective assistance of counsel under *Strickland v. Washington*, 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984), the defendant must show that his or her counsel's performance was deficient and that this deficient performance actually prejudiced the defendant's defense. *State v. Avina-Murillo, supra*. The fact that an ineffective assistance of counsel claim is raised on direct appeal does not necessarily mean that it can be resolved. *Id.* The determining factor is whether the record is sufficient to adequately review the question. *Id.*

Heckard claims he gave his trial counsel "a letter from Swayzer that contained content that put trial counsel on notice that had [trial] counsel called Swayzer to testify on [Heckard's] behalf, Swayzer would have provided evidence that would have exonerated [Heckard]." Brief for appellant at 29. He suggests Swayzer may have provided "exculpatory information, such as perhaps negating [Heckard's] knowledge of and intent to commit a burglary." *Id.* at 30.

Heckard's presentence investigation report lists Swayzer as a codefendant and indicates a case involving "[b]urglary" against Swayzer was dismissed in January 2015; there is no explanation for the dismissal. At a hearing in August 2017, Heckard commented that his

"co-[d]efendant . . . which [sic] is now deceased, admits guilt to [Heckard's] charges," referring to the burglary conviction of which Heckard had already been convicted at that point and the pending habitual criminal count. At the same hearing, Heckard began to mention a "letter," saying it was from "Swayzer, that [sic] is now deceased, admitting --," but the district court stopped Heckard to inform him that his statement was for him to "claim on appeal." Nothing confirms if Swayzer had died or, assuming he had, whether he died prior to or during Heckard's trial in 2014.

We note that back in January 2014, Heckard's trial counsel filed a "Motion to Take Deposition," requesting to take depositions of Johnson, Hale, and Swayzer, stating their testimony "may be of assistance to the parties in the preparation of this case and may be material or relevant to an issue to be determined at the trial of the offense." Heckard's trial counsel did not call any witnesses to testify on Heckard's behalf. Whether Heckard's trial counsel moved to depose Swayzer as a result of being put on notice by Heckard that Swayzer possessed exculpatory information is unclear; also, Heckard does not specify a timeframe for when he allegedly gave the letter to his trial counsel. Further, there is no district court order concerning the motion to depose Swayzer. Also, the record neither confirms that Heckard provided his trial counsel any sort of letter from Swayzer, nor does it reflect whether that letter exists.

Under these circumstances, we cannot discern whether Heckard's trial counsel was deficient or strategic in not calling Swayzer to testify (if it was even possible) and/or not otherwise incorporating Swayzer's letter, if admissible, for Heckard's defense. We agree with the State that our record on direct appeal is insufficient to address Heckard's claim. See *State v. Avina-Murillo, supra*.

## VI. CONCLUSION

We affirm the judgment of the district court.

AFFIRMED.